44 A.3d 592

TWENTY-FIRST CENTURY RAIL CORPORATION, PLAINTIFF, AND FRONTIER–KEMPER/SHEA/BEMO, JOINT VENTURE, PLAINTIFF–APPELLANT, v. NEW JERSEY TRANSIT CORP., DEFENDANT, AND PB AMERICAS, INC., F/K/A PARSONS BRINCKERHOFF QUADE & DOUGLAS, INC., DEFENDANT–RESPONDENT.

Argued January 31, 2012—Decided May 7, 2012.

Patricia A. Millett, a member of the District of Columbia bar, argued the cause for appellant (Lowenstein Sandler, attorneys; Steven E. Brawer, Paul W. Killian, a member of the bars of the Commonwealth of Virginia and the District of Columbia, and Mark J. Groff a member of the bars of the State of Maryland and the District of Columbia, on the brief).

Bruce D. Meller argued the cause for respondent (Peckar & Abramson, attorneys; Mr. Meller and Michael S. Zicherman, on the brief).

Justice HOENS delivered the opinion of the Court.

In this appeal, we consider whether an attorney who was retained to provide advice to a client in connection with a construction project violated RPC 1.9 by subsequently undertaking the representation of another party that was involved in the construction project whose interests were adverse to those of the former client. Both the trial court, and the Appellate Division in its published opinion, Twenty–First Century Rail Corp. v. N.J. Transit, 419 N.J.Super. 343, 17 A.3d 213 (App.Div.2011), concluded that the RPC did not bar the attorney from undertaking the subsequent representation and therefore declined to disqualify him and

his firm from the matter. Because our analysis of the project, the relationship among the parties to the litigation, and the role played by the attorney, demonstrates that the subsequent representation was prohibited by the clear terms of *RPC* 1.9, we reverse the Appellate Division's judgment.

## I.

The relevant facts about the underlying construction project and the roles played by the parties in relation to that project are not in dispute. Understanding those facts, however, provides the necessary backdrop for our evaluation of the appropriate application of *RPC* 1.9 to the question now before this Court.

## A.

This dispute arises in the context of a large construction project known as the Hudson–Bergen Light Rail Transit System. The overall project was intended to create a light rail system that would run from Bayonne to North Bergen, a distance of approximately eighteen and one-half miles. One portion of that much larger project, identified as the N30 Project, involved work to be performed at the northern terminus of the light rail system. The N30 Project included work enlarging and rehabilitating an existing tunnel in Weehawken, constructing a station within the tunnel to be called the Bergenline Station, building an above-ground plaza at Bergenline Avenue, constructing an elevator shaft that would run between the plaza and the underground station, and integrating signals and switches into the overall Train Control System.

Defendant New Jersey Transit is the owner of the overall project and defendant Parsons Brinckerhoff, now known as PB Americas, Inc., served as the project engineer for the N30 Project. In its capacity as the project engineer, PB Americas was charged with responsibility for the project design, work that included

creating most of the engineering documents and providing interpretations of the documents for the N30 Project.

Plaintiff Twenty–First Century Rail Corporation served as the prime contractor for the N30 Project. In January 2002, Twenty–First Century, acting through its contracting affiliate, Washington Group, entered into a contract with Frontier–Kemper/Shea/Bemo, Joint Venture (FKSB). Pursuant to that contract, FKSB was responsible for construction of "the civil, electrical, mechanical and emergency system portions of the tunnel, station, plaza, and elevators" for the N30 Project.

In 2004, FKSB retained Bruce Meller and his law firm, Peckar & Abramson, in connection with the work that FKSB was performing on the N30 Project.[1] In particular, Richard Raab, who was an officer of FKSB and who served as its representative, first telephoned Meller in February 2004 and arranged to meet with him at the Peckar & Abramson offices. The meeting, which took place on March 8, 2004, included Raab, Meller, and Charles F. Kenny, Jr., who was one of Meller's law partners.

Raab signed a retainer agreement on behalf of FKSB, pursuant to which the lawyers were asked to provide FKSB with certain legal advice. Although there is a disagreement about what documents were provided and what specific information was disclosed to the lawyers in advance of or during that meeting, there is no doubt about the general subject matter on which the attorneys' advice was sought. In short, FKSB was concerned about its rights and obligations in connection with a series of delays that had occurred during the N30 Project and that were impeding

---

[1] Much of the record relating to the subject of the advice sought and given by the lawyers is confidential and was provided to this Court under seal. Although we granted in part a motion to dissolve that seal, because certain of the documents critical to our discussion remain protected by the seal, our description is necessarily somewhat oblique. However, because many of the relevant details were included in the Appellate Division's published opinion, we draw our recitation largely from that source.

FKSB in the completion of the work assigned to it pursuant to its contract.

More specifically, at the time of the consultation with Meller and Kenny, FKSB revealed its concern that Washington Group, the contracting affiliate of plaintiff Twenty–First Century, would hold FKSB responsible for the ongoing project delays. As a result, part of what FKSB sought advice from the lawyers about with respect to its contract rights necessarily related to FKSB's attribution of responsibility for the various delays to others. In particular, according to Raab's certification, during the meeting with Meller and Kenny, Raab "discussed, in confidence, delay, contractual and impact issues including those that potentially could be the responsibility of co-plaintiff [Washington Group] or FKSB and . . . what I believed were design issues that would have been the responsibility of . . . PB [Americas]."

The law firm provided its opinion on the issues about which it had been consulted in the form of a letter dated March 24, 2004, which was signed by Kenny. That letter makes plain that the lawyers had been told that FKSB sought their advice in connection with the assertion by Washington Group that FKSB was the sole party responsible for the delays and that FKSB wanted to be advised of the risks that it was facing as well as whether Washington Group could, in essence, lay the blame for all of the delays at FKSB's doorstep. As a result, FKSB necessarily revealed to the lawyers both the claims that Washington Group was raising about the causes of the delays and FKSB's contrary view about which party or parties were responsible for those delays.

Significantly for purposes of the dispute now before this Court, the March 24, 2004, letter identifies one of the causes to which FKSB attributed some or all of the delays on the project. That is, the letter includes the observation that the lawyers were asked to consider what was referred to as "design and constructability issues" on the N30 Project. That phrase can only have been a reference to the work that had been performed by PB Americas, the project engineer.

The lawyers sent FKSB a bill for their services following the meeting and the preparation of the March 24, 2004, opinion letter. That bill revealed that their work was completed in approximately twenty hours, for which the law firm requested payment in the amount of $5,360.08. *Twenty–First Century, supra,* 419 *N.J.Super.* at 351, 17 *A.*3d 213.

Approximately a year later, Meller received a telephone call from Paul Killian, an attorney affiliated with Akin, Gump, Strauss, Hauer & Feld. Meller and Killian agree that they knew each other from their involvement in an earlier, unrelated matter. Killian advised Meller that he represented FKSB and that he wanted to know what relationship, if any, Meller had with Washington Group. In particular, Killian wanted to know Meller's view about Washington Group because FKSB was considering whether to enter into a liquidating agreement with that entity. As part of his response, Meller told Killian that he was no longer on good terms with Washington Group and advised against making an agreement with it.

Although Meller and Killian generally agree about that much, their further recollections about the 2005 telephone conversation diverge on one point that the trial court and the appellate panel deemed to be significant to the analysis of the applicable *RPC*. In a certification filed in opposition to the motion to disqualify him and his law firm from this litigation, Meller asserted that "Killian advised [Meller] that he represented FKSB, and he acknowledged [Peckar & Abramson's] prior assignment for FKSB." Killian's certification was directly to the contrary, asserting that "[Meller] is incorrect that I either mentioned P[eckar] & A[bramson]'s prior representation of ... FKSB or that it was discussed." According to Killian, when he called Meller in 2005, it was not because he recalled, or was even aware of, the 2004 retainer of Meller's firm or the opinion letter. Rather, Killian asserted that he called Meller only because he was aware that Meller had dealings with Washington Group and hoped to learn what working with that entity as a part of a joint prosecution would be like.

Although the parties dispute what, if anything, Killian knew[2] or recalled about the earlier representation, there is no doubt that Meller was at all times well aware that he and his law firm had a prior attorney-client relationship with FKSB. There is also no doubt that Meller and his law firm were aware that FKSB was a target of Washington Group's ire over project delays in 2004.

In the current litigation, however, Twenty–First Century, for which Washington Group was the contracting affiliate, and FKSB are allied through a joint prosecution agreement. Their complaint alleges, in relevant part, that PB Americas was responsible for the construction delays on the N30 Project and for the resulting costs because of its "grossly defective" project designs and slow responses to requests for corrections needed to effectively and efficiently prosecute the work on the project.

Moreover, in the current litigation, Peckar & Abramson, the law firm which counts Meller and Kenny among its partners, has been retained to represent PB Americas, the entity responsible for the design and engineering on the N30 Project. The question for this Court is whether, in light of the earlier retainer and engagement by FKSB that led to the March 24, 2004, opinion letter, the representation of PB Americas by the lawyers or their law firm violates RPC 1.9.

## II.

FKSB filed its disqualification motion after the law firm rejected its request to withdraw voluntarily. The trial court addressed the matter during sealed proceedings during which the court heard the parties' arguments. Those arguments concerned the nature of the information that would have been revealed to the law

---

[2] In November 2008, there was another telephone call between Killian and Meller. By that time, Killian had learned that Meller was representing PB Americas and called to discuss a possible tolling agreement with him. The two largely agree about the substance of that conversation, which did not include a reference to the 2004 representation.

firm in connection with its earlier representation of FKSB and preparation of the March 24, 2004, opinion letter. In that context, the court considered certifications filed by Killian, Raab and Meller, and it undertook to elicit testimony from Meller and Killian [3] about the facts that were within their personal knowledge, including the disputed 2005 telephone communication.

Following the hearing, the trial court denied the disqualification motion, expressing its reasons in a written opinion. In summary, the trial court concluded that the proper framework for applying *RPC* 1.9 to this motion was found in our recent discussion concerning how to determine when successive matters are "substantially related." *See City of Atlantic City v. Trupos*, 201 *N.J.* 447, 992 *A.*2d 762 (2010). Using that framework, the trial court reasoned that many of the documents that would have been provided to the law firm for its use in preparing the March 24, 2004, opinion letter were publicly available and it found "no complicated information" in the opinion letter itself.

Although relevant to the "substantially related" framework of *Trupos*, the court made no finding about whether confidences were disclosed, instead describing the 2004 representation as being "insignifican[t] and immateria[l]." That observation became the basis for the court's conclusion that even though "both matters involve FKSB's work at the Project, as well as [Washington Group]'s contractual obligations to FKSB on the Project," the prior engagement was a limited one and the matters were not

---

[3] The Appellate Division's opinion points out that the trial court's procedure was flawed because only one of the attorneys from whom the court sought testimony was placed under oath. *Twenty-First Century, supra,* 419 *N.J.Super.* at 353, 17 *A.*3d 213. Although we have previously held, *see City of Atlantic City v. Trupos,* 201 *N.J.* 447, 463, 992 *A.*2d 762 (2010) (quoting *Dewey v. R.J. Reynolds Tobacco Co.,* 109 *N.J.* 201, 222, 536 *A.*2d 243 (1988)), and we reiterate, that motions for disqualification of counsel should ordinarily be resolved on the papers, we recognize that this may not always be possible. However, to the extent that the trial court concluded that testimony was necessary, it should not have embarked on such an unusual inquiry. Instead, the better course would have been to schedule a plenary hearing during which the court could have more appropriately addressed its concerns.

substantially related using the framework established in *Trupos.* On that basis, the trial court concluded that disqualification was not warranted.[4]

The Appellate Division affirmed the denial of the motion for disqualification in its published opinion. *Twenty–First Century, supra,* 419 *N.J.Super.* at 365, 17 *A.*3d 213. In doing so, the panel disagreed with the trial court's evaluation of the information that was revealed to the law firm, concluding that it "was entitled to be treated and protected as client confidences." *Id.* at 361, 17 *A.*3d 213. Notwithstanding that conclusion, the panel reasoned that because the "record does not demonstrate an alignment between" the assertions made by Raab in his certification about the nature of the confidences he disclosed and "the myriad issues involved in the instant litigation," it fell short of meeting the test we articulated in *Trupos. Id.* at 362, 17 *A.*3d 213 (citing *Trupos, supra,* 201 *N.J.* at 469, 992 *A.*2d 762).

Conceding that it was "not oblivious to the obvious: the N30 Project is the same project for both of [Peckar & Abramson]'s representations, the parties are the same, the contracts are the same, and the existence of delays is the same," the appellate panel found that those facts were insufficient to "engender materiality or relevance." *Id.* at 363, 17 *A.*3d 213. For those reasons, the

---

[4] The trial court also engaged in an alternative analysis it characterized as resting on theories of waiver or extraordinary circumstances. The court found that Meller's recollection about the substance of the 2005 telephone conversation was more likely accurate than Killian's, and that therefore Killian was aware of the "dual representation" before the time when FKSB's litigation attorneys found the March 24, 2004, letter while preparing for document discovery, and which, they contend, precipitated their disqualification motion. Nonetheless, the trial court found that Killian's denial that the prior representation was discussed at that time was simply due to faulty memory and specifically rejected the argument that FKSB "intentionally allowed the dual representation to extend through March 2010." Applying the five-factor test for disqualification adopted in the federal courts, *see Alexander v. Primerica Holdings, Inc.,* 822 *F.Supp.* 1099, 1115 (D.N.J.1993), the trial court rejected the argument made by PB Americas that FKSB had deliberately delayed filing a motion for disqualification or had engaged in any kind of gamesmanship.

panel affirmed[5] the trial court's denial of the disqualification motion.

Following the appellate panel's decision affirming the denial of the motion to disqualify counsel, we granted FKSB's motion for leave to appeal. 206 *N.J.* 37, 17 *A.*3d 815 (2011).

## III.

Central to our consideration of this appeal is the language of *RPC* 1.9(a), which governs attorneys who engage in successive representation of different clients in the same or substantially related matters. In relevant part, it provides: "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." *RPC* 1.9(a).

In *Trupos*, we explained that the prohibition of *RPC* 1.9(a) "is triggered when two factors coalesce: the matters between the present and former clients must be 'the same or ... substantially related,' and the interests of the present and former clients must be 'materially adverse.' " *Trupos, supra,* 201 *N.J.* at 462, 992 *A.*2d 762 (quoting *RPC* 1.9(a)).

In evaluating motions for the disqualification of counsel for an adversary pursuant to this *RPC*, we have long recognized that "a motion for disqualification calls for us to balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel."

---

[5] In reaching its decision, the panel explicitly declined to adopt the trial court's alternative waiver analysis, citing its "strong reservations" about the adequacy of the factual basis relied on by the trial court; the court's failure to consider the procedural posture of the litigation; and the reliance on "waiver" in the absence of "extraordinary circumstances," all of which militated against using the alternative theory to permit continued representation in the face of a violation of *RPC* 1.9. *Twenty–First Century, supra,* 419 *N.J.Super.* at 364–65, 17 *A.*3d 213.

*Dewey v. R.J. Reynolds Tobacco Co.*, 109 *N.J.* 201, 218, 536 *A.*2d 243 (1988) (citations and internal quotation marks omitted). In determining how to strike that balance fairly, courts are required to recognize and to consider that "a person's right to retain counsel of his or her choice is limited in that there is no right to demand to be represented by an attorney disqualified because of an ethical requirement." *Ibid.* (citation and internal quotation marks omitted). We have adopted a burden-shifting approach to utilize in this inquiry, *see Trupos, supra,* 201 *N.J.* at 462, 992 *A.*2d 762, and we have commented that our evaluation of an appeal from an order granting or denying a disqualification motion invokes our de novo plenary review in light of the fact that a decision on such a motion is made as a matter of law, *id.* at 463, 992 *A.*2d 762. With these considerations to guide us, we turn to our evaluation of the issue raised in this appeal.

## A.

Our most recent consideration of a dispute about the meaning of *RPC* 1.9(a) involved an attorney who had previously been retained by a municipality to represent it in tax appeals and who thereafter undertook to represent individual taxpayers in their tax appeals in subsequent years. *Trupos, supra,* 201 *N.J.* at 452–55, 992 *A.*2d 762. In that context, we were required to decide whether the prior and subsequent representations fell within the language in *RPC* 1.9(a) that prohibits representation in substantially related matters. In *Trupos,* we identified the appropriate analytical framework to be utilized in determining whether matters are substantially related:

> [F]or purposes of *RPC* 1.9, matters are deemed to be "substantially related" if (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation. We adopt that standard because it protects otherwise privileged communications, *see RPC* 1.6(a) (proscribing revelation of "information relating to representation of a client"), while also requiring a fact-sensitive analysis to ensure that the

congruity of facts, and not merely similar legal theories, governs whether an attorney ethically may act adverse to a former client.

[*Id.* at 467, 992 A.2d 762.]

In applying that standard to the facts identified in the record in *Trupos,* we concluded that the similarities between the initial engagement and the challenged representation were only superficial ones, *see ibid.,* and that a careful scrutiny of the two different periods of representation, the interests of the parties, and the matters in dispute fell short of the test that we had devised to implement the underlying purposes of the *RPC, see id.* at 467–68, 992 A.2d 762.

Central to that evaluation were two conclusions that we reached based on the record that was before us in that matter. First, there was nothing in the record on appeal that demonstrated that the municipality, which was the first client, had revealed any confidences to the lawyer. *Id.* at 469, 992 A.2d 762. Second, there was nothing about the earlier litigation, which focused on defending the municipality in connection with tax appeals filed on behalf of casinos and similar commercial entities, that was relevant to the matters the lawyer thereafter sought to pursue on behalf of the individual clients in their separate residential tax appeals. *Ibid.* Using that record and that interpretation of the *RPC,* we concluded that the trial court's order disqualifying the lawyer was unwarranted. *Id.* at 470, 992 A.2d 762.

B.

■ Although the parties in this appeal focus on the proper application of the two-part test devised in *Trupos* for determining whether, for purposes of disqualification, two matters are substantially related, we begin instead with a far more fundamental aspect of *RPC* 1.9(a), and one not germane to our analysis in *Trupos.*

In clear language, *RPC* 1.9(a) begins with a prohibition that precludes an attorney from engaging in the representation of an adverse client in the same matter unless the former client con-

sents in writing. *RPC* 1.9(a). Therefore, if the prior and the subsequent matters are indeed the same, the representation, absent written consent of the former client, is prohibited. In that circumstance, we need not conduct the inquiry into whether the matters are substantially related that we deemed necessary to undertake in *Trupos*. Nor need we apply the *Trupos* two-part test that includes the consideration of whether client confidences were communicated to the lawyer.

Indeed, in *Trupos*, it was only because the matters in which the attorney undertook the prior and the subsequent representation were not the same, but at most were substantially related, that we were required to devise a test to decide the issue. Moreover, it was only because the *RPC's* plain prohibition of subsequent representation in the same matter, absent written consent by the former client, was not directly before this Court that the survey of possible methodologies for deciding the issue of similarity, *see Trupos, supra*, 201 *N.J.* at 465–67, 992 *A.2d* 762, was even of concern to us.

The record before us in this matter therefore begins from a markedly different analytical starting point than the one we utilized in light of the circumstances presented in *Trupos*. If, indeed, the current matter is "the same" as the matter in which the lawyer previously represented FKSB, then because the lawyer failed to secure FKSB's written consent to it, this representation is prohibited by plain operation of *RPC* 1.9(a). We begin, then, with a consideration of whether the matters are the same. Our review of that question need only be brief, because there is abundant evidence in this record that they are.

Both disputes arise in the context of a large, multi-phase construction project. Although that fact, taken alone, would not suggest that the disputes are the same, the two successive matters that give rise to the disqualification dispute are far more focused than merely being part of one large project. Both matters involve the same discrete phase of that overall project, the same contracts, the same parties and, based upon our evaluation of the

documents that the parties have provided concerning the matters on which FKSB consulted the lawyers in the first instance, the same dispute.

That it is the same dispute is apparent from the language used in the March 24, 2004, letter prepared by the lawyers that FKSB now seeks to disqualify. That letter includes a reference to and discussion of a threat of litigation by Washington Group relating to delays in the N30 Project, a theory upon which that litigation would proceed against FKSB, and a consideration of the possible alternative ground for FKSB's defense that would implicate the liability of PB Americas.

In particular, the description in the letter of a consideration of the "design and constructability issues," *Twenty-First Century, supra,* 419 *N.J.Super.* at 352, 17 *A.*3d 213 as being the cause of or a contributing factor in causing the delays, is a clear reference to the potential responsibility of PB Americas rather than FKSB. Although the Appellate Division considered that reference to be wanting because the letter did not further explain its meaning, there can be no doubt about its implications to the parties to this litigation. That language makes plain that counsel was aware of and considered the adverse positions of FKSB, the lawyer's now-former client, and PB Americas, the subsequent and current client.

There is other evidence in this record that demonstrates that the matters are the same. As part of the certification filed in opposition to the disqualification motion, Meller points out that he advised his new client, PB Americas, about the former representation and the work he had performed for FKSB in 2004. That, however, is not the lawyer's obligation under the *RPC;* instead, once he recognized that he had previously represented the new client's adversary in the same matter, as he concededly did from the first moment of his new engagement, it was his obligation to reach out to the former client and affirmatively seek that client's permission before undertaking the new representation. Nothing in the record suggests that the lawyer discharged his duty under

the rule by seeking, in writing as required by *RPC* 1.9(a), or even orally, the consent of FKSB to the representation of its adversary. That, we conclude, is fatal [6] to the suggestion that the subsequent representation should now be permitted to proceed.

In reaching our conclusion that this is the same dispute, we need not focus, as we did in *Trupos* and as the appellate panel did in this matter, on whether in the context of seeking the advice from counsel, FKSB revealed confidences, because disqualification, if the matter is indeed the same, does not turn on the identification of any particular confidence having been revealed. *See, e.g., In re Cipriano,* 68 *N.J.* 398, 404, 346 *A.2d* 393 (1975) (observing, in context of imposing discipline, that "chang[ing] sides during the struggle, where the subject matter was interrelated with that which the attorney initially handled ... generates a seeming conflict of interest even if no confidential information had been or would be utilized"). That inquiry arises, as it did in *Trupos,* when the matters are not the same and the court is charged with the task of determining whether they are substantially related for purposes of applying *RPC* 1.9(a).

Nonetheless, were we to demand in this case that the former client point to a confidence that was revealed to the lawyer as part of demonstrating that the lawyer must be disqualified from subse-

---

[6] Although not directly raised in this appeal, we are constrained to comment on the trial court's alternative analysis. In addition to sharing the appellate panel's "strong reservations" about the adequacy of the trial court's factual findings and the panel's observation that waiver is an insufficient basis for disqualification in the absence of extraordinary circumstances, our de novo review of the record reveals a fatal analytical flaw in the trial court's reasoning as a matter of law. Even if Killian was aware of Meller's prior representation during the 2005 telephone call, there is no basis on which to find that Killian or FKSB was consciously aware of the prior representation when he was told to contact Meller in November 2008 to discuss the execution of a tolling agreement, and thus no ground on which to conclude that the conflict was waived. On the contrary, the trial court's specific finding arising from the November 2008 call is that FKSB did not intentionally delay filing the disqualification motion, as a result of which the trial court's alternate suggestion that FKSB waived the lawyer's conflict of interest cannot be sustained.

quent representation of an adversary in the same matter,[7] the March 24, 2004, letter's reference to the consideration of the potential blameworthy behavior of PB Americas would suffice.

We recognize that a client's right to be represented by counsel of its choosing is an important one to be both cherished and protected. We also reiterate, however, that the right is not unfettered, but is one that can only be appropriately exercised in careful compliance with the *RPCs* that govern attorneys and that serve to protect the legitimate interests of their former clients. In particular, the clear proscription included in *RPC* 1.9(a) against undertaking representation, in the same matter, of a client whose interests are materially adverse to a previously-represented client requires that the motion to disqualify be granted.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.

---

[7] During the pendency of this appeal, counsel for PB Americas moved for leave to supplement the record on appeal so as to add information learned during on-going discovery to the previously-filed appendix and to advise this Court of the contents of case management orders. Our review of the information generated during discovery does not alter our analysis of any of the factual issues before this Court. Moreover, in light of the shortcomings in the trial court's alternate analysis, the assertions concerning the continuation of discovery during the pendency of this appeal are insufficient to demonstrate the sort of circumstances in which disqualification has been deemed inappropriate. *See, e.g., Dewey, supra,* 109 *N.J.* at 219, 221, 536 *A.*2d 243; *Barnes v. R.J. Reynolds Tobacco Co.,* 246 *N.J.Super.* 348, 355–56, 587 *A.*2d 667 (App.Div.1991); *G.F. Indus. v. Am. Brands,* 245 *N.J.Super.* 8, 16–17, 583 *A.*2d 765 (App.Div.1990).